453 So.2d 1376 (1984)
FLORIDA PATIENT'S COMPENSATION FUND, Appellant,
v.
Joseph TILLMAN, Howmedica, Inc., et al., Appellees.
ST. MARY'S HOSPITAL, Appellant,
v.
Joseph TILLMAN, Bruce Waxman, M.D., et al., Appellees. (Two Cases)
Joseph TILLMAN, Appellant,
v.
ST. MARY'S HOSPITAL, Etc., et al., Appellees.
Bruce WAXMAN, M.D., Appellant,
v.
Joseph TILLMAN, Appellee.
Bruce WAXMAN, M.D., Appellant,
v.
Joseph TILLMAN, et al., Appellees.
Nos. 82-1197, 82-1199, 82-1370, 82-1433, 82-1527 and 82-1823.
District Court of Appeal of Florida, Fourth District.
July 13, 1984.
Rehearings Denied September 10, 1984.
*1377 Perkins & Collins, Tallahassee, for Florida Patient's Compensation Fund.
*1378 David F. Crow of Paxton, Crow, Bragg & Austin, P.A., West Palm Beach, for St. Mary's Hospital.
Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, and Kocha & Houston, P.A., West Palm Beach, for Joseph Tillman.
Robert M. Klein and Debra Levy Neimark of Stephens, Lynn, Chernay & Klein, P.A., Miami, for Bruce Waxman, M.D.
HERSEY, Judge.
These consolidated appeals devolve from a medical malpractice action.
Joseph Tillman developed a knee problem which required the surgical implantation of a two-element prosthesis manufactured by Howmedica, Inc. The surgery was performed by Dr. Bruce Waxman at St. Mary's Hospital on April 12, 1978. The prosthetic device obtained by St. Mary's Hospital from another hospital consisted of a tibia component and a fibula component. Each of these components is manufactured in two sizes. The prosthesis inserted in Tillman's knee consisted of mismatched components. Shortly after the surgical procedure Dr. Waxman advised Tillman that mismatched elements had been implanted in the knee. Some difficulty with the knee was encountered by Tillman almost immediately, and ultimately another surgeon performed corrective surgery which, because of deterioration of bone structure, required that the knee be fused.
On February 29, 1980, plaintiff Tillman filed his initial complaint naming St. Mary's Hospital and Howmedica, Inc., as defendants. On December 2, 1980, Dr. Waxman was added as a defendant. On July 9, 1981, Florida Patient's Compensation Fund was added as a defendant. Subsequently, Waxman and the Fund filed motions for summary judgment based upon the statute of limitations. Both motions were denied and the case proceeded to trial. During trial Dr. Waxman made a motion for directed verdict based upon the statute of limitations. The motion was denied. St. Mary's motion for directed verdict, based on the argument that there was no evidence on the hospital's standard of care or its negligence, was likewise denied. Also during the trial Dr. Waxman withdrew his affirmative defense of comparative negligence.
At the conclusion of the trial the jury found Tillman 12% negligent, St. Mary's Hospital 8% negligent, and Dr. Waxman 80% negligent. The jury found the total amount of damages to be $150,000. The trial court entered judgment on May 7, 1983, awarding Tillman $132,000 after reducing the damages by 12%, representing Tillman's comparative negligence. The final judgment is the subject of several of the appeals prosecuted by the parties  Tillman, Dr. Waxman, St. Mary's Hospital and Florida Patient's Compensation Fund. Thereafter, the trial court awarded attorney's fees to Tillman and that order, dated July 30, 1982, is also appealed by Dr. Waxman.

APPEAL OF DR. WAXMAN
Waxman relies upon the medical malpractice statute of limitations in urging that his motions for summary judgment and directed verdict were erroneously denied. The applicable statute, Section 95.11(4)(b), Florida Statutes, as amended in 1975 (thus rendering cases under the former version of the statute relied upon by Waxman of doubtful value as precedent) provides:
An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence; however, in no event shall the action be commenced later than 4 years from the date of the incident or occurrence out of which the cause of action accrued.... In those actions covered by this paragraph in which it can be shown that fraud, concealment, or intentional misrepresentation of fact prevented the *1379 discovery of the injury within the 4-year period, the period of limitations is extended forward 2 years from the time that the injury is discovered or should have been discovered with the exercise of due diligence, but in no event to exceed 7 years from the date the incident giving rise to the injury occurred.
Discovery of the "incident giving rise to the cause of action" is the point when the statute begins to run. In Swagel v. Goldman, 393 So.2d 65 (Fla. 3d DCA 1981), the court equated "incident" with the "now-alleged surgical malpractice." The term "incident," however, could not refer solely to the particular medical procedure since that would obviously be "discovered" at the time it was performed, rendering nugatory the additional two year period permitted by the statute for discovering the incident. Thus, the term must encompass (1) a medical procedure; (2) tortiously performed (3) which injures (damages) the patient. The question, then, is when did Tillman discover the "incident." The testimony presented below was conflicting.
After Dr. Waxman learned about the mismatched knee components he called Howmedica. Waxman testified that an engineer for Howmedica said "that he thought it would work out fine and he thought there was a slight impingement on the tibial spines, but that this would be resolved by cold flow." In support of Dr. Waxman's testimony, Dr. Diaz (who assisted with the operation) testified that after Waxman spoke with Howmedica, "[h]e was assured that it should work very well and that if any problem occurred, that it would probably be what we call cold flow... . He was advised that it should do quite well." This state of mind of Waxman, that no harm had been done, bears out Tillman's version of subsequent events. According to Tillman, within a few days after the operation Waxman told him that he "thought [he] had implanted the wrong or mismatched sizes" but that he "thought that it would work but [he] wasn't sure." On each of the subsequent office visits, Waxman "told him [Tillman] he was improving... ."
Tillman admitted that he never improved after the operation, but when he told Waxman, Waxman allegedly "didn't pay any attention. He acted like he wasn't paying a bit of attention...." Tillman testified that he learned for the first time that his leg needed another operation when x-rays were taken at Dr. Ennis' office in January or February of 1979. Although Tillman had last seen Dr. Waxman in January of 1979, Waxman never told Tillman he would need another operation.
In addition to the very real possibility that Tillman was never in a position to recognize that an incident had occurred, there exists another factual determination which affects our consideration. If Tillman knew of the mismatched components shortly after the operation, the statute would begin to run only if the subsequent damage was caused by the mismatched components. Although the evidence would support a finding to that effect, there was evidence of other possible causes which were never brought to Tillman's attention.
Dr. Petty performed the corrective operation on Tillman. When Petty opened the knee, he found the prosthesis was "quite unstable." Petty then tried to replace the prothesis with a larger one but was "unable to get good bone fixation and good stability." He decided to fuse the knee.
When asked for his opinion regarding the instability of the right knee replacement, Petty responded as follows:
I think there are two or three possibilities. Possibility Number 1 would be for the, at the time of the total knee arthroplasty either excessive bone was removed, or too small a prosthesis was put in place, or a combination of those two, and those two are very closely related, and it is difficult to say either/or.
... .
Another possibility is that the patient had such sever [sic] instability prior to *1380 this total knee arthroplasty that with whatever components or with the biggest component available, stability could still not be achieved. I don't believe the latter was the cause in this instance though.
Regarding the first reason, by "too small a prosthesis," Petty meant the tibial and femoral parts were too small in their thickness and size. Petty believed that Tillman needed a thicker tibial component but he also stated that "[t]he femoral component was smaller than what was ideal for the patient." When asked what led to his belief that the femoral component was smaller than ideal, Petty responded, "[t]he femoral component [was] considerably narrower than the distal femoral bone that it resurfaces." Although the doctor thought the components were too small for Tillman, he did not have an opinion as to whether the two components were, in fact, mismatched.
In addition to Dr. Petty's deposition testimony, the jury saw a video deposition of Dr. Volz. When asked whether he felt Dr. Waxman removed too much bone, Volz stated:
Yes, I believe he did. I believed  not necessarily did he remove too much bone, but he did not insert a wide enough plastic component part to properly place the ligaments under appropriate tension... . That either too much bone was removed, and if so, not enough  not a thick enough plastic component was inserted.
The doctor further stated that his "criticism [was] not that too much bone was removed, it was that if he had taken that much bone, he should have then used a wider component part."
Dr. Volz was then asked whether the stability of the knee would have been better if the components had been matched. He responded as follows:
My opinion is that if the standard femoral component had been used with the standard tibial component, there would have been some added measure of stability other than what is observed when one mates a small femoral component with the standard tibial. I will concede that there is some degree of stability with that degree of mismatch but there is not as much stability, that is lessened chance for dislocation, with this combination as we can observe using a standard femoral and a standard tibial.
On this same point, he further stated, "I think the issue of the mismatching might not have been a problem at all if he'd used a wider piece of plastic. I think that's the critical deficiency."
Regarding the issue of too much bone being removed, Waxman's counsel conceded that Tillman did not know about that.
Where there is a question as to notice or discovery in a medical malpractice action, it is for the jury to decide when the statute of limitations begins to run. Weiner v. Savage, 407 So.2d 288 (Fla. 4th DCA 1981); Phillips v. Mease Hospital & Clinic, 445 So.2d 1058 (Fla. 2d DCA 1984). Here, the jury concluded that the period had not expired at the time Waxman was brought into the litigation. There was evidence upon which the jury could have concluded either that Tillman did not discover that the mismatched components were causing an injury until early 1979 or that the injury was caused by the removal of too much bone or the use of a prosthesis that was too small. This was sufficient to take the question to the jury and to sustain its ultimate position that the cause of action was not barred by the statute of limitations.
Waxman's point IV is rendered moot by the foregoing determination and his point II is without merit.
Point III suggests that the trial court committed error in awarding attorney's fees to Tillman on the basis that the original complaint was filed prior to the effective date of the medical malpractice attorney's fee statute, Section 768.56, Florida Statutes, although Waxman was joined *1381 as a defendant subsequent to its effective date. We agree this was error. Theodorou v. Burling, 438 So.2d 400 (Fla. 4th DCA 1983).

APPEAL OF ST. MARY'S HOSPITAL
The only issue raised by St. Mary's is the failure of the trial court to direct a verdict in its favor because the plaintiff, having the burden, failed to establish what standard of care should be applied as to it and failed to offer expert testimony as to its negligence. (We use the term plaintiff throughout this discussion for clarity.)
St. Mary's argues that the evidence did not establish any standard of care, relying on Memorial Hospital v. Doring, 106 So.2d 565 (Fla. 2d DCA 1958). In that case, the doctor ordered complete bed rest for a patient. The patient was placed in a bed without rails (rails were not ordered by the doctor), and either fell out of the bed or fell after he got up from the bed. The patient admitted that he did not need special nursing care. In addition, the court specifically found that the record failed to disclose what the hospital should have done but failed to do. Therefore, the appellate court held a verdict should have been directed in favor of the hospital.
In the case at bar, the plaintiff clearly alleges that the hospital failed to check the femoral component to make sure it provided the right size to the doctor. The manager of surgery at St. Mary's, Harry Wallace, admitted that he had the responsibility to ensure that the proper components were received by the hospital and further admitted that he failed to check the components used in this operation; further, that it was standard procedure to check the stock numbers to ensure that the proper components had been received. The head nurse also failed to check the size of the femoral component before surgery.
These witnesses stated that they failed to check the components because they did not know that Howmedica, Inc., manufactured different sizes. However, the evidence showed that Howmedica, Inc., had been manufacturing different sizes for at least a year before this surgery; that the salesman for Howmedica stated that he had discussed the knee and the various sizes with Wallace prior to the surgery; and that other hospitals knew there were different size components. Thus the evidence itself established that the hospital deviated from its regular standard of care by not checking the components and that it should have known there were different sizes.
The hospital's failure to check the components used in the operation would appear to constitute an obvious breach of duty which would be apparent to persons of common knowledge. Thus we hold, contrary to St. Mary's position, that expert testimony was not required. In Atkins v. Humes, 110 So.2d 663 (Fla. 1959), the court stated that "a jury would have the right to conclude that it is negligence ... to fail to sterilize surgical instruments before performing an operation... ." Id. at 666 (citing Lanier v. Trammell, 207 Ark. 372, 180 S.W.2d 818 (1944)). See also Stepian v. Bay Memorial Medical Center, 397 So.2d 333 (Fla. 1st DCA), pet. for review dismissed, 402 So.2d 607 (Fla. 1981).
Finally, St. Mary's asserts that even if the hospital failed to notice the femoral component, its failure did not cause any injury to the plaintiff. According to St. Mary's, the plaintiff's expert testimony established that his problem could have been attributed to either too much bone being removed, or the use of too small a prosthesis (including the tibial and femoral components). Although Dr. Petty testified that he did not notice if the components were mismatched, he did state that "the femoral component was smaller than what was ideal for this patient."
Because the fact that the hospital failed to check the components before surgery constituted an obvious breach of duty, and *1382 because a smaller femoral component than what was ideal for the patient may have contributed to the ultimate failure of the operation, the trial court did not err in denying St. Mary's motion for a directed verdict.

APPEAL OF DEFENDANT FLORIDA PATIENT'S COMPENSATION FUND
Defendant, Florida Patient's Compensation Fund (Fund), contends that the trial court erred in denying its motion for summary judgment. It is undisputed that Tillman admits he discovered his injury no later than February of 1979. However, he failed to add the Fund as a defendant until July 9, 1981. The Fund asserts that because the two year statute of limitations, Section 95.11(4)(b), Florida Statutes, applies to "the health care provider and persons in privity with the provider of health care," Tillman's failure to add it as a defendant within two years entitled it to summary judgment.
Tillman contends that he was in privity only with the hospital and Dr. Waxman and therefore the two year statute of limitations was not applicable as to the Fund. Further, Tillman argues that the "insurer's exception" to the statute of limitations should be applied and cites Davis v. Williams, 239 So.2d 593 (Fla. 1st DCA 1970), and Clemons v. Flagler Hospital, Inc., 385 So.2d 1134 (Fla. 5th DCA 1980), for this position.
We disagree that the statute of limitations defense is available to Florida Patient's Compensation Fund in the present case. We, instead, are persuaded by the logic and therefore adopt the rationale of Judge Ferguson's dissent in Fabal v. Florida Keys Memorial Hospital, 452 So.2d 946 (Fla. 3d DCA 1984). In so doing we acknowledge that we create a direct and express conflict with the following cases: Taddiken v. Florida Patient's Compensation Fund, 449 So.2d 956 (Fla. 3d DCA 1984); Burr v. Florida Patient's Compensation Fund, 447 So.2d 349 (Fla. 2d DCA 1984); Owens v. Florida Patient's Compensation Fund, 428 So.2d 708 (Fla. 1st DCA), pet. for review denied, 436 So.2d 100 (Fla. 1983); Mercy Hospital, Inc. v. Menendez, 371 So.2d 1077 (Fla. 3d DCA 1979), cert. denied & appeal dismissed, 383 So.2d 1198 (Fla. 1980); and Fabal v. Florida Keys Memorial Hospital, supra.
St. Mary's argues that if the judgment is reversed as to the Fund, then the judgment against St. Mary's should be limited to $100,000, the maximum liability of the health care provider under Section 768.54, Florida Statutes. However, we held in Florida Medical Center, Inc. v. Von Stetina, 436 So.2d 1022, 1028 (Fla. 4th DCA 1983), that Section 768.54(2)(b), Florida Statutes (1977), "imposes no substantive limitation upon plaintiff's right to judgment in the full amount" and found that section unconstitutional. Therefore, the plaintiff is entitled to recover against St. Mary's without limitation.

APPEAL OF PLAINTIFF, JOSEPH TILLMAN
Tillman argues that since Waxman withdrew his affirmative defense of comparative negligence and the jury was so advised by Waxman's counsel, Waxman was not entitled to the 12% reduction of the judgment (the percentage of negligence attributed to Tillman). Additionally, Tillman argues that a defendant may not benefit from an affirmative defense he fails to present and cites Searcy v. Godwin, 129 Ga. App. 827, 201 S.E.2d 670 (1973), and Haddock v. Smithson, 30 N.C. App. 228, 226 S.E.2d 411, review denied, 290 N.C. 776, 229 S.E.2d 32 (1976). We agree.
In Searcy the defendant never raised the statute of limitations and the court said that the defendant could not "avail himself of an affirmative defense which he failed to properly present." Id. 201 S.E.2d at 671-72. In Haddock, one of the defendants pled contributory negligence while the other defendant did not. The court found that because the defendants filed separate answers, the defendant who failed to raise contributory negligence in his answer could not take advantage of the other defendant's claim for contributory negligence to support a summary judgment in favor of *1383 both defendants. In both Searcy and Haddock, the defendants failed to plead an affirmative defense; thus the court did not permit either of them to take advantage of the defense in the proceeding.
In the case at bar, Waxman initially pled the affirmative defense but then withdrew it during trial. The defense of comparative negligence was maintained by St. Mary's Hospital and therefore presented to the jury. Waxman argues that "any defense filed by one defendant, common to a codefendant, inures to the benefit of that codefendant." Allied Chemical Corp. v. Van Buren School Dist. No. 42, 264 Ark. 810, 575 S.W.2d 445, 448 (1979). Waxman additionally argues that the comparative negligence defense was common to both himself and St. Mary's and that the jury ultimately found the plaintiff 12% negligent. Since Section 768.31(3)(a), Florida Statutes, Uniform Contribution Among Tortfeasors Act (1982), provides that joint tortfeasors are responsible for their pro rata share of the entire liability, if Waxman is liable for the full $150,000, he argues that he will pay more than his pro rata share.
However, having withdrawn his defense of comparative negligence and so informing the jury, Waxman will not be permitted to take advantage of the defense simply because it is now to his benefit to do so. The final judgment should reflect a reduction for St. Mary's Hospital based on the plaintiff's negligence but Waxman should not be afforded the same reduction.
Upon remand the lower tribunal is instructed to make such corrections in its judgment and orders as are necessary to reflect that:
1. Tillman is not entitled to attorney's fees under Section 768.56, Florida Statutes;
2. The amount of damages recoverable from Waxman is not to be reduced for comparative negligence.
In all other respects we affirm.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
LETTS and BERANEK, JJ., concur.